C. Brooks Cutter (SBN 121407)
David E. Smith (SBN 72703)
Stuart C. Talley (SBN 180374)
**KERSHAW, CUTTER & RATINOFF, LLP**
980 9th Street, 19th Floor
Sacramento, California 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Richard A. Lockridge
Robert K. Shelquist
Yvonne M. Flaherty
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2197
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

*Attorneys for Plaintiffs West and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIE WEST and PAMELA WEST on behalf of themselves and all Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MEDTRONIC, INC., MEDTRONIC PUERTO RICO, INC., and MEDTRONIC PUERTO RICO OPERATIONS CO., <br><br> Defendants. | CASE NO. _____ <br><br> **CLASS ACTION** <br> **COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Willie West and Pamela West ("Plaintiffs" or "Plaintiff West"), by their

undersigned counsel, for themselves and all others similarly situated, hereby commence this class

action against Medtronic, Inc., Medtronic Puerto Rico, Inc., and Medtronic Puerto Rico

Operations Co. (hereinafter collectively "Defendants" or "Medtronic" or the "Company," unless

otherwise stated) for compensatory, equitable, injunctive, and declaratory relief. Plaintiffs make

-1-

1  the following allegations based upon their personal knowledge as to their own acts, and upon

2  information and belief, as well as upon their attorneys' investigative efforts as to Medtronic's

3  actions and misconduct, and alleges as follows:

4  **JURISDICTION AND VENUE**

5      1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the

6  Class Action Fairness Act of 2005. The matter in controversy in this class action exceeds

7  $5,000,000, exclusive of interest and costs, and some members of the class are citizens of states

8  other than the states in which Defendants are incorporated and have their principal place of

9  business.

10      2.    Venue is also proper under 28 U.S.C. § 1391(a) because this action involves

11  parties who are citizens of different states and the acts or omissions giving rise to the Plaintiffs'

12  claim occurred in this Judicial District.

13      3.    Venue is also proper under 28 U.S.C. § 1391(b) because the Court's jurisdiction is

14  not founded primarily on diversity of citizenship and a substantial part of the events or omissions

15  giving rise to the Plaintiffs' claim occurred in this Judicial District.

16      4.    Venue is also proper under 28 U.S.C. § 1391 because Defendant Medtronic, Inc.

17  conducts business in this District and all three defendants earn substantial compensation and

18  profits from sales of Sprint Fidelis leads in this District.

19  **INTRADISTRICT ASSIGNMENT**

20      5.    Pursuant to Civil L.R. 3-5(b) and Civil L.R. 3-2(d), Plaintiffs state that assignment

21  of this action to the San Francisco Division of this Court is appropriate because the acts or

22  omissions giving rise to the Plaintiffs' claim occurred in this Judicial District and Defendant

23  Medtronic, Inc. conducts in this District and all three defendants earn substantial compensation

24  and profits from sales of Sprint Fidelis leads in this District.

25  **INTRODUCTION**

26      6.    This is a nationwide class action brought on behalf of Plaintiffs and other

27  individuals similarly situated who, during the period of January 1, 2004 through October 15,

28  2007, were implanted with the defective Sprint Fidelis leads (the "leads") that were designed,

manufactured, promoted, marketed, distributed and sold by Medtronic under the following model numbers:

        (a)    the 6949 LFJ extendable/retractable screw fixation (S) model;

        (b)    the 6948 LFH tuned fixation (T) model;

        (c)    the 6931 LFT S fixation; and

        (d)    the 6930 LFK T fixation.

7.     These leads were first approved by the FDA in September of 2004 and since that time have been implanted in approximately 268,000 patients worldwide, including 144,000 implanted in patients in the United States. On March 21, 2007, Medtronic issued a physician advisory warning doctors that the Company was investigating reports of lead failures. Thereafter, on October 15, 2007, Medtronic recalled all un-implanted leads, stating that there was a reasonable probability that the leads could cause serious injury or death. The Company further recommended that all implanted leads be monitored.

8.     At all relevant times, Medtronic misrepresented the safety of the Sprint Fidelis leads, and negligently manufactured, marketed, advertised, promoted, sold and distributed the leads as safe and effective devices to be used for implantation with implantable cardiac devices ("ICDs") for prophylactic treatment of patients with prior myocardial infarction and a limited ejection fraction, patients who have had spontaneous and/or inducible life-threatening ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias.

9.     As a result of their defective design and manufacture, the Sprint Fidelis leads can fail and cause serious physical trauma and/or death. Medtronic knew and had reason to know of this tendency and the resulting risk of injuries and deaths, but concealed this information and did not warn Plaintiff or her physicians, preventing Plaintiff, the Class and their physicians, and the medical community from making informed choices about the selection of leads for implantation. Approximately 129,000 of the affected devices remain in service in the United States.

10.     As a result of the defective and hazardous leads, Plaintiff and other members of the Class have incurred injuries and damages. Plaintiff and other members of the Class seek injunctive, compensatory, equitable, statutory and punitive relief. In addition, Plaintiff and the

-3-

class seek declaratory relief and a medical monitoring program for class members who are implanted with the defective leads.

### PARTIES

11.    Individual and representative Plaintiff Willie West is a citizen and resident of the County of Alameda, State of California,. Plaintiff West has a cardiovascular condition that necessitates the use of an ICD. Plaintiff West was implanted with an ICD and leads on October 1, 2004 at Washington Hospital in Fremont, California. The ICD was attached to his heart with a lead wire system called a Sprint Fidelis lead, model number 6949, manufactured by defendants, and each of them.

12.    Plaintiff Pamela West is a citizen and resident of the County of Alameda, State of California. She is the spouse of Willie West, and claims damages as set forth below.

13.    Defendant Medtronic, Inc. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Medtronic develops technology to treat conditions such as heart disease and other illnesses. Medtronic manufactures medical devices and sells them worldwide. Medtronic's Cardiac Rhythm Disease Management Division ("CRM Division") is the division that develops, researches, advertises, promotes, markets and sells all of Medtronic ICDs, and leads, some of which are marketed under the trade name "Sprint Fidelis." CRM Division's operations are principally conducted out of its facilities at Cardiac Rhythm Disease Management at 7000 Central Ave., Minneapolis, Minnesota 55432.

14.    Defendant Medtronic Puerto Rico, Inc. is a corporation existing by virtue of the laws of the Territory of Puerto Rico, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, PR.

15.    Defendant Medtronic Puerto Rico Operations Co., Inc. is a corporation existing by virtue of the laws of the Territory of Puerto Rico, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, PR.

16.    Medtronic Puerto Rico, Inc. and Medtronic Puerto Rico Operations Co., Inc. are the wholly owned subsidiaries of Medtronic, Inc. and formulate, develop, manufacture and sterilize the devices at issue in this lawsuit.

-4-

**SUBSTANTIVE ALLEGATIONS**

**A.    Use of Implantable Cardiac Devices**

17.    Medtronic designs, researches, develops, manufactures, tests, markets, advertises, promotes, distributes, and sells products that treat cardiac arrhythmias, heart failure, and coronary and peripheral vascular disease.  An arrhythmia is an irregular cardiac rhythm, which can cause significantly decreased cardiac output and ultimately, death.  Medtronic considers itself to be "the global leader in medical technology, alleviating pain, restoring health, and extending life for millions of people around the world."  See Medtronic's annual report for the year ended April 27, 2007, filed on Form 10-K on June 25, 2007, available at http://www.sec.gov/Archives/edgar/data/64670/000089710107001326/0000897101-07-001326-index.htm, last visited on November 6, 2007.

18.    Medtronic and other manufacturers produce a number of devices designed to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms, including ICDs.  ICDs contain pacemakers as well as defibrillators.  While a pacemaker is used primarily to correct slow heart rates, an ICD detects and corrects both fast and slow heart rates.  The pacemaker portion corrects the slow rates and the anti-tachycardia portion can "over-drive pace" rapid rates.  The defibrillator portion can shock ventricular tachycardia and ventricular fibrillation to stop the heart and allow an appropriate rhythm to take over.

19.    ICDs are designed to be implanted primarily under the skin of the chest wall.  The device's power source, or pulse generator, is implanted in a pouch formed in the chest wall generally over the left pectoralis major muscle.

20.    Wires called "leads" are typically inserted through a major vein and attached directly to the muscle on the inside of the heart.  Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can administer an electric shock to abort a dangerous "over-drive pace," a very rapid rhythm, or pace the heart at a normal rhythm if an irregularity is detected.

21.    Such devices are used in patients, like Plaintiff, who have arrhythmias or irregular heartbeats that are considered life-threatening.  The Class members with these medical problems

-5-

include patients who are at risk for conditions such as ventricular fibrillation (rapid, ineffective contraction of the ventricles of the heart) or ventricular tachycardia (excessively rapid heartbeat), which are poorly controlled by medication. Without the therapy provided by an appropriate device to put the heart back into an appropriate cardiac rhythm, these arrhythmias or irregular heart beats can result in the loss of consciousness or death.

22.     If an implanted ICD and lead operate properly, the system can save a patient's life. If either the ICD or the leads fail to operate properly, the patient may be seriously injured or die.

23.     The majority of ICDs now use two or three leads. As a result, smaller high-voltage leads are attractive to electrophysiologists because they are believed to be easier to insert, and are less likely to obstruct blood flow or distort the tricuspid valve.

**B.    Medtronic Introduces the Sprint Fidelis Lead**

24.     In 2001, Medtronic marketed its then-smallest defibrillation lead called the Sprint Quattro Secure, model 6947 ("Quattro leads").

25.     On September 2, 2004, Medtronic announced that it had received approval by the United States Food and Drug Administration (the "FDA") for the sale of its Sprint Fidelis leads, which it introduced and marketed as "the world's smallest right ventricular defibrillation leads." See Medtronic Announces U.S. FDA Approval Of New Defibrillation Leads For Patients At Risk Of Sudden Cardiac Arrest, The Nation's No. 1 Killer, September 2, 2004 (hereinafter, "Sept. 2nd Release"), available at http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1095281834568&format=print&lang=en_US, last visited on November 6, 2007.

26.     These Sprint Fidelis leads were researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic to be used in connection with ICDs.

27.     At the time that Medtronic announced the marketing of the Sprint Fidelis leads, Medtronic claimed that "[t]he small size of the Sprint Fidelis (Fidelis is a Latin word that means faithful') helps improve passage into a patient's venous system for an easier implant, and minimizes venous obstruction." Medtronic also touted these leads as "state-of-the-art." See Sept. 2nd Release.

-6-

28.     Medtronic further represented that the Sprint Fidelis leads were based on the "proven" design of the Quattro leads. Indeed, Medtronic sought to replace the Quattro leads with the Sprint Fidelis leads as the high voltage lead of choice and to attempt to gain a larger market share.

29.     The Sprint Fidelis leads are 6.6 French isodiametric multifilar true bipolar high voltage leads with silicone insulation and polyurethane outer coating. French is a measure of circumference used for these leads. The Models 6949 and 6948 have two high voltage coils; the 6930 and 6931 models have a single right ventricular high voltage coil. As of January 2007, approximately 160,000 Sprint Fidelis leads have been implanted in patients worldwide, including 144,311 model 6949 leads, 7,510 model 6948 leads, 5,387 model 6931 leads, and 236 model 6930 leads.

## C.     The Defective Sprint Fidelis Leads

30.     Since the introduction of the leads to the market, it has become apparent that a significant portion of the leads have potentially serious and/or fatal defects. These defects were discussed in an article written by doctors at The Minneapolis Heart Institute, one of the premiere heart institutes in the world, based on a study of the incidence of lead failures in the Sprint Fidelis models compared to the Sprint Quattro models. According to the report, which was prepared by Dr. Robert G. Hauser, et al., and published in the Heart Rhythm Society Journal in the Spring of 2007, "Early Failure of Small-Diameter High-Voltage Inflammable Cardioverter-Defibrillator Lead," Heart Rhythm Society 2007.03.041 (2007) (hereinafter, "Early Failures"), the Minneapolis Heart Institute's experience reflected that, between September 2004 and February 2007, 583 patients were implanted with Sprint Fidelis Model 6949 leads, and nine patients received other Sprint Fidelis models. During that time, six patients experienced Sprint Fidelis Model 6949 lead failures. The failed Sprint Fidelis Model 6949 leads had been implanted by various electrophysiologists, cardiologists and thoracic surgeons. The average time to failure was fourteen months (based on a range of four to twenty-three months). Early Failures, p. 893.

31.     The study compared the actuarial survival of the 583 Sprint Fidelis Model 6949 leads implanted at the Minneapolis Heart Institute to the survival of 285 Sprint Quattro Model

1    6947 leads implanted at the Institute between November 2001 and March 2007. The difference in

2    survival between the Sprint Fidelis Model 6949 lead and the Sprint Quattro Secure Model 6947

3    lead was extremely significant. The failure rate for the Sprint Fidelis Model 6949 lead was 1-2%

4    during the first two years of implant and was ten times greater than the failure rate for the Sprint

5    Quattro Secure Model 6947 lead. Early Failures, p. 893-894.

6        32.    The significant number of lead failures involved lead fractures of the PACE-sense

7    conductor or coil in the Sprint Fidelis Model 6949. The fracture rate for the Sprint Fidelis leads

8    was three times higher than the fracture rate of the Quattro Model 6947. Early Failures, p. 894-

9    895.

10        33.    Another study, conducted at Cornell University Medical Center by Sunil

11    Mirchandani, et al., found that a "17% incidence of abnormal [right ventricular] sensing was

12    observed during follow-up of [patients] implanted with the Medtronic Sprint Fidelis ICD lead"

13    which "necessitated an early revision of the system in 4% of [patients]." See Abstract of

14    Defibrillator Leads: Is Smaller Necessarily Better?, 2006, available at http://vivo.library.cornell.

15    edu/entity?home=&id=30168, last visited on November 6, 2007.

16        34.    Medtronic has not disclosed the precise mechanism of the Sprint Fidelis lead

17    fracture failures. However, it appears that the defect in the Sprint Fidelis may be attributable to

18    the smaller diameter of the coil and conductors. As a result of this small diameter, the leads are

19    subject to stress damage both during and after implantation, and fracture eventually occurs when

20    the conductor is critically overstressed. The number of fractures that have been observed in these

21    leads indicates that there is a clear defect in the leads themselves, and that defect was

22    demonstrated in the 6931 leads that were implanted in Plaintiff West.

23        35.    In addition, a review of the FDA's Manufacturer and User Facility Device

24    Experience ("MAUDE") database, which contains reports of adverse events associated with the

25    use of medical devices, reveals that, as of July 2007, over 1000 Medical Device Reports

26    ("MDR's") regarding Sprint Fidelis lead had been filed since September 2004. The most frequent

27    complaints were fracture and inappropriate shocks, and the most common observations were high

28    impedance, oversensing and noise, and failure to capture or high threshold.

-8-

36.     Medtronic analyzed approximately 125 of those leads that were returned to Medtronic before July 2006. According to the relevant MDR reports, Medtronic concluded that 77 out of 125 leads (or 62%) were defective. The predominant manifestation of the defect was conductor fracture, involving the PACE-sense conductor and coil or the high voltage (defibrillation) conductor. PACE-sense conductor or coil fracture was manifested by inappropriate shocks or oversensing/noise and high impedance, while high voltage conductor fracture was primarily linked to high impedance.

37.     In addition, Medtronic itself filed more than 350 additional MDRs regarding the Sprint Fidelis leads between August 2006 and February 2007. However, Medtronic did not include similar analysis of those leads in the MDRs it filed during this period.

38.     On March 21, 2007, Medtronic issued a physician advisory, in the nature of a "Dear Doctor Letter," that advised physicians of "the higher than expected conductor fracture rates in … Sprint Fidelis leads." In this letter, Medtronic claimed to be investigating reports of lead failures, however, it still represented that the Sprint Fidelis leads were performing consistent with, and "in line with other Medtronic leads …. And consistent with lead performance publicly reported by other manufacturers." This letter also stated, "…variables within the implant procedure may contribute significantly to these fractures… For conductor fractures that occur around the suture sleeve, our preliminary investigation suggests that under certain implant techniques, the lead appears to be exposed to severe bending or kinking in the pectoral area." At no time prior to this letter did Medtronic warn physicians that its leads must be specially handled during the implantation procedure or that they could "severely bend" or "kink" if they are implanted using certain accepted implant techniques.

39.     On October 15, 2007, Medtronic issued a Class 1 Recall of all un-implanted Sprint Fidelis leads model numbers 6949 LFJ extendable/retractable screw fixation (S) model; the 6948 LFH tuned fixation (T) model; the 6931 LFT S fixation; and the 6930 LFK fixation (T) model. According to the FDA recall notice, a Class 1 recall is the most serious type of recall and involves situations in which there is a "reasonable probability that use of the product will cause serious injury or death." The recall also urged individuals who have been implanted with Sprint Fidelis

-9-

leads to contact their physician. See Class 1 Recall: Medtronic Inc. Sprint Fidelis® Defibrillator Leads, available at http://www.fda.gov/cdrh/recalls/recall-101507.html, last visited on November 6, 2007.

40.    During the Class Period, and at all other relevant times, Medtronic misrepresented the safety of the Sprint Fidelis leads and negligently manufactured, marketed, advertised, promoted, sold, and distributed the leads as safe devices to be used together with ICDs for prophylactic treatment of patients with prior myocardial infarction and a decreased ejection fraction, ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias. Some patients are dependent on such devices to maintain an appropriate heart rhythm, and therefore, adequate cardiac output. For these patients, failure of the leads connected to the ICD can cause sudden faintness, or loss of consciousness, and can result in death.

41.    As a result of their defective design and manufacture, Medtronic's Sprint Fidelis leads suffer fracture or other failure, leading to malfunction in the transmission of the electric signal from the ICD to the patient's heart, which can cause serious physical trauma and/or death. Medtronic knew and had reason to know of this tendency and the resulting risk of injuries and deaths, but concealed this information and did not warn Plaintiff or her physicians, preventing Plaintiff, the Class and their physicians, and the medical community from making informed choices about the selection of leads for implantation.

42.    At all times relevant to this action, Medtronic knew, and had reason to know, that the Sprint Fidelis leads were not safe for the patients for whom they were prescribed and implanted, because the leads fractured and otherwise malfunctioned, and therefore failed to operate in a safe and continuous manner, causing serious medical problems and, in some patients, catastrophic injuries and deaths. Indeed, Medtronic's representation of the consistency of the performance of the Sprint Fidelis leads is untrue in light of the reported experience with the leads and the various issues included in the MAUDE database reports.

43.    At all times relevant to this action, Medtronic knew, and had reason to know, that its representations that the Sprint Fidelis leads were easier to implant and based on "proven" technology were materially false and misleading.

-10-

44.     At all relevant times, Medtronic failed to warn that the Sprint Fidelis leads were prone to breakage or that particular processes should be implemented in order to avoid breaking the Sprint Fidelis leads.

45.     The Sprint Fidelis leads are uniformly defective in that they are prone to fracture of the PACE-sense conductor and coil and the HV conductor, causing them to fail to function in a manner which may not be immediately detectable by the patient.  The malfunctioning can lead to terrifying inappropriate defibrillation shocks, failure to deliver appropriate (life-giving) defibrillation therapy and death.

46.     There is no test that predicts which Sprint Fidelis leads will fail.

47.     To this day, Medtronic has refused to suggest replacement of the defective Sprint Fidelis leads in its patients, even though in patients whom these defects have been discovered, emergency replacement of the leads is required.

**D.      Medtronic Concealed the Defects of the Leads**

48.     Medtronic's failure to document or follow up on the known defects in its Sprint Fidelis leads, and concealment of known defects from the FDA, Plaintiff, the medical community and Class members constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

49.     No member of the Class could have discovered the existence of the defect in the Sprint Fidelis leads until, at least, March 2007, when the first physician advisory was sent by Medtronic to physicians concerning the fragile nature of these leads.

50.     Medtronic is estopped from relying on the statute of limitations defense because Medtronic actively concealed the lead defects, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians or class members. Instead of revealing the defects, Medtronic continued to represent its products as safe for their intended use.

51.     Medtronic's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Medtronic must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff and Class

-11-

1  members.

2  **E.    Medtronic Failed to Provide Adequate and Accurate Information About the Leads**

3      52.    Thousands of patients' lives rely upon the proper functioning of these Sprint

4  Fidelis leads, and they — along with their physicians — have been vigorously attempting to

5  assess the risks that they now face.

6      53.    Patients and physicians remain uninformed and confused about whether the

7  devices should be explanted, or even whether all of the defects have been disclosed.

8      54.    Because of incomplete, inconsistent, and/or confusing information published by

9  Medtronic, it remains unclear how many patients are affected by these defective leads, although

10  based on the population of Medtronic patients whose claims are asserted in this complaints, it is

11  likely to be at least 1,500 and could be as high as 6,000 heart patients in the United States.

12  **F.    Medtronic's Corporate Liability**

13      55.    At all times herein mentioned, each of the Defendants was the agent, servant,

14  partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants

15  herein and was at all times operating and acting within the purpose and scope of said agency,

16  service, employment, partnership, conspiracy and/or joint venture and rendered substantial

17  assistance and encouragement to the other Defendants, knowing that their collective conduct

18  constituted a breach of duty owed to Plaintiff.

19      56.    There exists and, at all times herein mentioned, there existed a unity of interest in

20  ownership between certain Defendants and other certain Defendants such that any individuality

21  and separateness between the certain Defendants has ceased and these Defendants are the alter

22  ego of the other certain Defendants and exerted control over those Defendants. Adherence to the

23  fiction of the separate existence of these certain Defendants as entities distinct from other certain

24  Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or

25  would promote injustice.

26      57.    At all times herein mentioned, Defendants, and each of them, were engaged in the

27  business of, or were successors in interest to, entities engaged in the business of researching,

28  designing, formulating, compounding, testing, manufacturing, producing, processing, assembling,

-12-

1  inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising

2  for sale, and selling products for use by Plaintiff. As such, each Defendant is individually, as well

3  as jointly and severally, liable to Plaintiff for Plaintiff's damages.

4      58.    At all times herein mentioned, the officers and/or directors of the Defendants

5  named herein participated in, authorized and/or directed the production and promotion of the

6  aforementioned products when they knew, or with the exercise of reasonable care and diligence

7  should have known, of the hazards and dangerous propensities of said products, and thereby

8  actively participated in the tortuous conduct that resulted in the injuries suffered by Plaintiff.

9                              **CLASS ACTION ALLEGATIONS**

10      59.    Plaintiffs bring this action on behalf of themselves and all others similarly situated,

11  as members of a proposed plaintiff class (the "Class") of all individuals who have been implanted

12  with the leads at issue, and propose a Nationwide Class, or in the alternative fifty-one statewide

13  classes, each composed of:

14          (a)    All residents and domiciliaries of the United States who have been

15  implanted with Sprint Fidelis leads manufactured by Medtronic ("patient recipients"), during the

16  period from January 1, 2004 through October 15, 2007 (the "Class period");

17          (b)    The spouses of patient recipients;

18          (c)    The estates, representatives, and administrators of deceased patient

19  recipients; and

20          (d)    The spouses, children, relatives, and "significant others" of deceased

21  patient recipients as their heirs or survivors.

22          (e)    Excluded from the proposed subclass are (i) Medtronic, any entity in which

23  Medtronic has a controlling interest or which have a controlling interest in Medtronic, and

24  Medtronic's legal representatives, predecessors, successors and assigns; (ii) the judicial officers to

25  whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

26      60.    The Class is so numerous that the individual joinder of all its members is

27  impracticable. While the exact number and identification of Class members is unknown to

28  Plaintiff at this time and can only be ascertained through appropriate discovery of Medtronic,

                                                    -13-

1  Plaintiff is informed and believes that the Class includes more than 100,000 patient recipients

2  worldwide.

3        61.    This action is brought and may properly be maintained as a class action pursuant

4  to the provisions of Federal Rule of Civil Procedure 23(a)(1)-(4), 23(b)(2), and 23(b)(3) and/or

5  23(c)(4)(A). This action satisfies the numerosity, commonality, typicality, adequacy,

6  predominance, and superiority requirements of those provisions. Common questions of fact and

7  law exist as to all Class members which predominate over any questions affecting only individual

8  Class members. These common legal and factual questions, which do not vary from Class

9  member to Class member, and which may be determined without reference to the individual

10  circumstances of any Class member, include, but are not limited to, the following:

11        (a)    Whether there are design and/or manufacturing defects in Medtronic's

12  Sprint Fidelis leads;

13        (b)    Whether Medtronic failed to follow United States Food & Drug

14  Administration ("FDA") good manufacturing practices, failed to properly investigate

15  manifestations of the lead defects over the past several years, failed to adequately document

16  reports of the defects, and failed to exercise adequate quality control;

17        (c)    Whether Medtronic's conduct in designing, manufacturing, marketing, and

18  monitoring the Sprint Fidelis leads fell below the duty of care owed by Medtronic to Plaintiff and

19  the other Class members;

20        (d)    Whether Medtronic intentionally, deliberately, uniformly, knowingly,

21  carelessly, recklessly, or negligently misrepresented, omitted, concealed and suppressed material

22  and important information regarding the existence of a defect in the Sprint Fidelis leads from

23  Plaintiff, the FDA, physicians and Class members;

24        (e)    Whether the Sprint Fidelis leads listed in the proposed class definition

25  share common and inherent design and manufacturing defects that cause them to fracture and

26  malfunction, causing inappropriate shocks and failure to deliver an effective shock when needed,

27  creating a risk of injury or death to patients in whom they were implanted;

28        (f)    Whether Medtronic negligently, intentionally, deliberately, uniformly, or

-14-

1  recklessly materially misrepresented, concealed, omitted, or suppressed the quality and usefulness

2  of the leads, thereby inducing Plaintiff and the Class to accept implantation of the Sprint Fidelis

3  leads rather than another brand of leads, which would not have been prone to the defects;

4         (g)    Whether Medtronic is liable for selling a dangerously defective product;

5         (h)    Whether Medtronic failed to adequately warn or notify patient recipients,

6  the medical community, and the regulators of the defect, dangers, disadvantages and hazards of

7  the leads;

8         (i)    Whether Medtronic failed to adequately warn or notify hospitals and

9  physicians regarding the defect, malfunction and/or hazards of the defective leads;

10         (j)    Whether Medtronic breached express or implied warranties;

11         (k)    Whether Medtronic's conduct constitutes negligence;

12         (l)    Whether Medtronic is liable for infliction of emotional distress;

13         (m)    Whether Medtronic's misconduct violated applicable consumer protection

14  statutes;

15         (n)    Whether Plaintiffs and Class members are entitled to injunctive and other

16  equitable relief, including restitution and disgorgement, and if so, the nature of such relief;

17         (o)    Whether Plaintiffs and Class members are entitled to medical monitoring

18  and surveillance and medical treatment at Medtronic's expense;

19         (p)    Whether Medtronic is liable for punitive or exemplary damages, and if so,

20  the amount necessary and appropriate to punish them for their conduct, to deter others, and to

21  fulfill the other policies and purposes of punitive and exemplary damages;

22         (q)    Whether Medtronic unjustly enriched itself at the expense of Plaintiff and

23  Class members; and

24         (r)    Which mechanism, among the methods available under the Federal Rules

25  of Civil Procedure, is superior to ensure the fair and efficient adjudication of this controversy

26  within the meaning of Fed. R. Civ. P. 23(b)(3).

27      62.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and

28  other Class members must prove the same facts in order to establish the same claims, described

-15-

1    herein, which apply to all Class members.

2        63.    Plaintiffs are adequate representatives of the Class because they is a member of the

3    Class and their interests do not conflict with the interests of the Class members they seek to

4    represent. Plaintiffs have retained counsel competent and experienced in the prosecution of

5    products liability, mass torts, and consumer fraud class actions, and together Plaintiffs and

6    counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of

7    Class members will fairly and adequately be protected by Plaintiffs and their counsel.

8        64.    A class action is superior to other available methods for the fair and efficient

9    adjudication of this litigation since individual litigation of the claims of all Class members is

10    impracticable. Even if every Class member could afford individual litigation, the court system

11    could not. It would be unduly burdensome to the courts, in which individual litigation of

12    thousands of cases would proceed. Individual litigation presents a potential for inconsistent or

13    contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation

14    of recovery among those with equally meritorious claims. Individual litigation increases the

15    expense and delay to all parties and the court system in resolving the legal and factual issues

16    common to all Medtronic Sprint Fidelis lead claims. By contrast, the class action device presents

17    far fewer management difficulties and provides the benefit of a single adjudication, economies of

18    scale, and comprehensive supervision by a single court.

19        65.    The various claims asserted in this action are additionally or alternatively

20    certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2)

21    because:

22        (a)    The prosecution of separate actions by thousands of individual Class

23    members would create a risk of inconsistent or varying adjudications with respect to individual

24    Class members, thus establishing incompatible standards of conduct for Medtronic;

25        (b)    The prosecution of separate actions by individual Class members would

26    also create the risk of adjudications with respect to them that would, as a practical matter, be

27    dispositive of the interests of the other Class members who are not a party to such adjudications

28    and would substantially impair or impede the ability of such non-party Class members to protect

their interests;

(c)     Medtronic has acted or refused to act on grounds generally applicable to the entire Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

### Strict Products Liability

66.     Plaintiff, on behalf of himself and all others similarly situated, re-alleges the allegations contained in the foregoing paragraphs.

67.     At all relevant times hereto, Medtronic was engaged in the business of designing, manufacturing, assembling, promoting, advertising, selling, and distributing the Sprint Fidelis leads for ultimate sale to, and implantation in, heart disease/disorder patients. Medtronic designed, manufactured, assembled, and sold the Sprint Fidelis leads to hospitals and physicians, knowing that they would be thereby sold to patients with heart diseases and disorders (including Plaintiff and Class members).

68.     Medtronic's Sprint Fidelis leads were expected to and did reach Plaintiff and the Class without substantial change in their condition as manufactured and sold by Medtronic. In light of the defects described herein, at the time the leads reached Plaintiff and the Class, they were in a condition not contemplated by any reasonable person among the expected users of the devices, and were unreasonably dangerous to the expected users of the devices when used in reasonably expectable ways of handling or consumption.

69.     The Sprint Fidelis leads designed, manufactured, assembled, and sold by Medtronic to Plaintiff and Class members were in a defective condition unreasonably dangerous to any user or consumer of the devices, and Plaintiffs and Class members were, and are, in the class of persons that Medtronic should reasonably have foreseen as being subject to the harm caused by the devices' defective condition.

70.     Plaintiff Willie West and other Class Members used the leads in the manner in which the leads were intended to be used. This has resulted in injuries to Plaintiff and Class

-17-

Members.

71.    Neither Plaintiff nor Class members, were aware of, and could not in the exercise of reasonable care have discovered, the defective nature of Medtronic's Sprint Fidelis leads, nor could they have known that Medtronic designed, manufactured or assembled the leads in a manner that would increase the risk of bodily injury to Plaintiff and the Class.

72.    As a direct and proximate result of Medtronic's design, manufacture, assembly, marketing and sales of the Sprint Fidelis leads, Plaintiff and the Class members have sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, and economic losses and consequential damages, and are therefore entitled to compensatory relief according to proof, and entitled to a declaratory judgment that Medtronic is liable to them for breach of its duty to Plaintiff and the Class members and Medtronic's failure to provide a safe and effective medical device; and Plaintiff and the Class members are entitled to equitable relief as described below.

73.    Medtronic's Sprint Fidelis leads constitute a product dangerous for its reasonably intended use, due to defective design, manufacture, assembly, and marketing.  Medtronic is therefore liable to Plaintiff and Class members in an amount according to proof.

**COUNT II**

**Breach of Implied Warranty**

74.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the allegations contained in the foregoing paragraphs.

75.    Medtronic impliedly warranted that its Sprint Fidelis leads, which Medtronic designed, manufactured, assembled, promoted and sold to Plaintiff and Class members, were merchantable and fit and safe for ordinary use.  Medtronic further impliedly warranted that its Sprint Fidelis leads were fit for the particular purpose of providing prophylactic treatment of patients with a variety of medical issues, including prior myocardial infarction and a limited ejection fraction, spontaneous and/or inducible life-threatening ventricular arrhythmias, and a high risk for developing such arrhythmias.

76.    Medtronic further impliedly warranted that its Sprint Fidelis leads were based on

-18-

1   "proven" lead technology and that the Sprint Fidelis leads were easier to implant.

2       77.    Medtronic's Sprint Fidelis leads were defective, unmerchantable, and unfit for

3   ordinary use when sold, and unfit for the particular purpose for which they were sold, and

4   subjected Plaintiff and Class members to severe and permanent injuries and death. Therefore,

5   Medtronic breached the implied warranties of merchantability and fitness for a particular purpose

6   when its leads were sold to Plaintiff and Class members, in that the leads are defective and have

7   fractured and otherwise failed to function as represented and intended.

8       78.    As a direct and proximate result of Medtronic's breach of the implied warranties of

9   merchantability and fitness for a particular purpose, Plaintiff and Class members have sustained

10  and will continue to sustain severe physical injuries and/or death, severe emotional distress, and

11  economic losses, and are therefore entitled to compensatory damages and equitable relief

12  according to proof.

13                          **COUNT III**

14                          **Negligence**

15      79.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the

16  allegations contained in the foregoing paragraphs.

17      80.    Medtronic had a duty to Plaintiff and Class members to provide a safe product in

18  design and manufacture, to notify the FDA of design flaws, and to warn the FDA and Class

19  members of the defective nature of the Sprint Fidelis leads. Medtronic breached its duty of

20  reasonable care to Plaintiff and Class members by incorporating a defect into the design of the

21  Sprint Fidelis leads, thereby causing Plaintiff's and Class members' injuries.

22      81.    Medtronic breached its duty of reasonable care to Plaintiff and Class members by

23  manufacturing and assembling the Sprint Fidelis leads in such a manner that they were prone to

24  fracture and fail to operate and malfunction and expose Plaintiff and Class members to life-

25  threatening physical trauma.

26      82.    Medtronic breached its duty of reasonable care to Plaintiff and Class members by

27  failing to notify the FDA at the earliest possible date of known design defects in the leads.

28      83.    Medtronic breached its duty of reasonable care to Plaintiff and Class members by

-19-

1  failing to exercise due care under the circumstances.

2       84.    As a direct and proximate result of the carelessness and negligence of Medtronic

3  as set forth in the preceding paragraphs, Plaintiff and Class members have sustained and will

4  continue to sustain severe physical injuries and/or death, severe emotional distress, economic

5  losses and other damages, are entitled to compensatory damages and equitable and declaratory

6  relief according to proof.  Medtronic's egregious misconduct alleged above also warrants the

7  imposition of punitive damages against Medtronic.

8                              **COUNT IV**

9                   **Intentional Infliction of Emotional Distress**

10       85.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the

11  allegations contained in the foregoing paragraphs.

12       86.    Medtronic engaged in extreme and outrageous conduct, knowingly and/or

13  recklessly marketing defective leads, knowingly and/or recklessly concealing a known and

14  potentially fatal defect from Plaintiff and Class members, and knowingly and/or recklessly

15  misrepresenting the quality and usefulness of the Sprint Fidelis leads.

16       87.    As a direct result of Medtronic's misconduct, Plaintiff and Class members have

17  sustained and will continue to sustain physical injuries and/or death, economic losses, and other

18  damages.

19       88.    Medtronic intended to cause Plaintiff and Class members severe emotional

20  distress, or acted with reckless disregard for the Plaintiff's and the Class members' emotional

21  states.

22       89.    Plaintiff and Class members did, in fact, incur (and continue to incur) severe

23  emotional distress as a result of Medtronic's misconduct.  Accordingly, Plaintiff and the Class

24  members are entitled to compensatory damages and equitable and declaratory relief according to

25  proof.

26       90.    Medtronic's misconduct alleged above warrants the imposition of punitive

27  damages against Medtronic.

28

1

2

**COUNT V**

**Negligent Infliction of Emotional Distress**

3      91.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the

4      allegations contained in the foregoing paragraphs.

5      92.    Medtronic carelessly and negligently manufactured, marketed and sold defective

6      Sprint Fidelis leads to Plaintiff and Class members, carelessly and negligently concealed these

7      defects from Plaintiff and Class members, and carelessly and negligently misrepresented the

8      quality, safety and usefulness of the leads.

9      93.    Plaintiff and Class members were directly involved in and directly impacted by

10     Medtronic's carelessness and negligence, in that Plaintiff and Class members have sustained and

11     will continue to sustain severe physical injuries and/or death, economic losses, and other damages

12     as a direct result of the decision to purchase, use and have implanted in their bodies a defective

13     and dangerous product manufactured, sold and distributed by Medtronic.

14     94.    Medtronic's misconduct as alleged above has caused Plaintiff and Class members

15     to suffer severe emotional trauma, physical consequences and long continued emotional

16     disturbance.  Plaintiff and Class members are therefore entitled to compensatory damages and

17     equitable and declaratory relief according to proof.

18

19

**COUNT VI**

**Violation of Consumer Protection Statutes**

20     95.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the

21     allegations contained in the foregoing paragraphs.

22     96.    Defendants have a statutory duty to refrain from unfair or deceptive acts or

23     practices in the design, development, manufacture, promotion and sale of the defective leads.

24     97.    Had the Defendants not engaged in the deceptive conduct described above,

25     Plaintiff would not have purchased and/or paid for the defective leads, and would not have

26     incurred related medical costs.

27     98.    Defendants' deceptive, unconscionable or fraudulent representations and material

28     omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and

-21-

deceptive acts and practices in violation of the state consumer protection statutes listed below.

99.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from Plaintiff for the defective leads that he would not have paid had Defendants not engaged in unfair and deceptive conduct.

100.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes, as listed below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Civ. Code §1770, et seq. and Cal. Bus. & Prof. Code § 17200, et seq.;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, et seq.;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, et seq.;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq.;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, et seq.;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110a, et seq.;

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code §§ 2511, et seq. and 2531, et seq.;

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.;

-22-

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §§10-1-372, et seq., 10-1-392 and 10-1-420;

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480-1, et seq.;

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.;

(n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, et seq.;

(o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5-1, et seq.;

(p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.16, et seq.;

(q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.;

(r)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.170, et seq.;

(s)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, et seq.;

(t)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 205A, et seq.;

(u)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.;

(v)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, et seq.;

(w)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. § 445.901, et seq.;

(x)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325D.43, et seq., 325F.67, et seq. and 325F.68 et seq.;

-23-

1          (y)    Defendants have engaged in unfair competition or unfair or deceptive acts

2    or practices in violation of Miss. Code Ann. § 75-24-1, et seq.;

3          (z)    Defendants have engaged in unfair competition or unfair or deceptive acts

4    or practices in violation of Vernon's Ann. Missouri Stat. § 407.010, et seq.;

5          (aa)    Defendants have engaged in unfair competition or unfair or deceptive acts

6    or practices in violation of Mont. Code Ann. § 30-14-101, et seq.;

7          (bb)    Defendants have engaged in unfair competition or unfair or deceptive acts

8    or practices in violation of Neb. Rev. Stat. § 59-1601, et seq.;

9          (cc)    Defendants have engaged in unfair competition or unfair or deceptive acts

10   or practices in violation of Nev. Rev. Stat. Ann. § 598.0903, et seq.;

11         (dd)    Defendants have engaged in unfair competition or unfair or deceptive acts

12   or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq.;

13         (ee)    Defendants have engaged in unfair competition or unfair, unconscionable

14   or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, et seq.;

15         (ff)    Defendants have engaged in unfair competition or unfair or deceptive acts

16   or practices in violation of N.M. Stat. § 57-12-1, et seq.;

17         (gg)    Defendants have engaged in unfair competition or unfair or deceptive acts

18   or practices in violation of N.Y. Gen. Bus. Law §§ 349 et seq. and 350-e, et seq.;

19         (hh)    Defendants have engaged in unfair competition or unfair or deceptive acts

20   or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.;

21         (ii)    Defendants have engaged in unfair competition or unfair or deceptive acts

22   or practices in violation of N.D. Cent. CODE §§ 51-12-01, et seq., and 51-15-01, et seq.;

23         (jj)    Defendants have engaged in unfair competition or unfair or deceptive acts

24   or practices in violation of Ohio Rev. Stat. § 1345.01, et seq.;

25         (kk)    Defendants have engaged in unfair competition or unfair or deceptive acts

26   or practices or made false representations in violation of Okla. Stat. 15 § 751, et seq.;

27         (ll)    Defendants have engaged in unfair competition or unfair or deceptive acts

28   or practices in violation of Or. Rev. Stat. § 646.605, et seq.;

-24-

1    (mm)    Defendants have engaged in unfair competition or unfair or deceptive acts
2  or practices in violation of 73 Pa. Stat. § 201-1, et seq.;

3    (nn)    Defendants have engaged in unfair competition or unfair or deceptive acts
4  or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq.;

5    (oo)    Defendants have engaged in unfair competition or unfair or deceptive acts
6  or practices in violation of S.C. Code Laws § 39-5-10, et seq.;

7    (pp)    Defendants have engaged in unfair competition or unfair or deceptive acts
8  or practices in violation of S.D. Codified Laws § 37-24-1, et seq.;

9    (qq)    Defendants have engaged in unfair competition or unfair or deceptive acts
10  or practices in violation of Tenn. Code § 47-18-101, et seq.;

11    (rr)    Defendants have engaged in unfair competition or unfair or deceptive acts
12  or practices in violation of Tex. Bus. & Com. Code § 17.41, et seq.;

13    (ss)    Defendants have engaged in unfair competition or unfair or deceptive acts
14  or practices in violation of Utah Code. § 13-11-1, et seq.;

15    (tt)    Defendants have engaged in unfair competition or unfair or deceptive acts
16  or practices in violation of 9 Vt. § 2451, et seq.;

17    (uu)    Defendants have engaged in unfair competition or unfair or deceptive acts
18  or practices in violation of Va. Code § 59.1-196, et seq.;

19    (vv)    Defendants have engaged in unfair competition or unfair, deceptive or
20  fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, et seq.;

21    (ww)    Defendants have engaged in unfair competition or unfair or deceptive acts
22  or practices in violation of West Virginia Code § 46A-6-101, et seq.;

23    (xx)    Defendants have engaged in unfair competition or unfair or deceptive acts
24  or practices in violation of Wis. Stat. §100.20, et seq.; and

25    (yy)    Defendants have engaged in unfair competition or unfair or deceptive acts
26  or practices in violation of Wyo. Stat. § 40-12-101, et seq.

27    101.    Plaintiff was injured by the cumulative and indivisible nature of Defendants'
28  conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and

-25-

1  consumers was to create demand for and sell the defective leads. Each aspect of Defendants'

2  conduct combined to artificially create sales of the defective leads.

3      102.    The medical community relied upon Defendants' misrepresentations and

4  omissions in determining which cardiac device to utilize.

5      103.    By reason of the unlawful acts engaged in by Defendants, Plaintiff has suffered

6  ascertainable loss and damages.

7      104.    Defendants violated the applicable consumer fraud statutes designed to protect

8  consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices

9  and false advertising, by knowingly and falsely representing that the leads were fit to be used for

10 the purpose for which they were intended, when in fact the leads were defective and dangerous,

11 and by other acts alleged herein. The representations were made in uniform promotional

12 materials.

13     105.    The actions and omissions of Defendants alleged herein are uncured or incurable

14 deceptive acts under the applicable consumer fraud statutes. Defendants had actual knowledge of

15 the defective and dangerous condition of the Sprint Fidelis leads, and failed to take any action to

16 cure such defective and dangerous conditions.

17     106.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff was

18 damaged by paying in whole or in part for these defective leads.

19     107.    As a direct and proximate result of Defendants' violations of state consumer

20 protection statutes, Plaintiff has sustained economic losses and other damages for which he is

21 entitled to statutory, compensatory damages and declaratory relief in an amount to be proven at

22 trial. Defendants are liable to Plaintiff jointly and severally for all general, special and injunctive

23 relief to which Plaintiff is entitled by law. Under statutes enacted in California and all other

24 states, and the District of Columbia, to protect consumers against unfair, deceptive, fraudulent

25 and unconscionable trade and business practices and false advertising, Plaintiff and Class

26 members are consumers who purchased Medtronic's Sprint Fidelis leads pursuant to a consumer

27 transaction for personal use and are therefore subject to protection under such legislation.

28

## COUNT VII

### Breach of Express Warranties

108.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the allegations contained in the foregoing paragraphs.

109.    Defendants expressly warranted to Plaintiff by and through Defendants and/or their authorized agents or sales representatives, in publications, the internet, and other communications intended for medical patients, and the general public, that the defective leads were safe, effective, fit and proper for their intended use.

110.    In allowing the implantation of the defective leads, Plaintiff relied on the skill, judgment, representations, and express warranties of Defendants.  These warranties and representations were false in that the defective leads were not safe and were unfit for the uses for which they were intended.

111.    Through its sale of the defective leads, Defendants are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

112.    Any disclaimers of express warranties are ineffectual as they were not provided to Plaintiff or otherwise made known to Plaintiff.  In addition, any such disclaimers are unconscionable.

113.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff has sustained economic losses and other damages for which he is entitled to compensatory damages in an amount to be proven at trial.  Any disclaimer of consequential damages is invalid as the limited remedy provided fails in its essential purpose to redress the harm and damages to Plaintiff in that it, in effect, provides no remedy at all for the defect necessary to be redressed.  In addition, any such disclaimer of consequential damages in unconscionable.  Defendants are liable to Plaintiff jointly and severally for all damages to which Plaintiff is entitled by law.

///

///

## COUNT VIII

### Violation of the Minnesota Prevention of Consumer Fraud Act

114.   Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

115.   Defendants intentionally concealed their design and manufacturing defects and failed to disclose the defects for the purpose of continuing to sell and distribute the defective leads.

116.   As alleged above, Defendants represented that the defective leads were safe and effective and intended that Plaintiff and his physicians rely on those representations when deciding if Defendants' defective leads were optimal for meeting the Plaintiff's needs.

117.   Through these misleading and deceptive statements and false promises, Defendants violated Minn. Stat. § 325F.69.

118.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, economic losses and other damages for which he is entitled to statutory, compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  Defendants are liable to Plaintiff jointly and severally for all general, special and equitable relief to which Plaintiff is entitled by law.

## COUNT IX

### Unjust Enrichment

119.   Plaintiffs, on behalf of themselves and all others similarly situated, re-allege the allegations contained in the foregoing paragraphs.

120.   As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase of Defendants' defective leads by Plaintiff.

121.   Defendants have voluntarily accepted and retained these profits and benefits, derived from the Plaintiff, with full knowledge and awareness that, as a result of Defendants' wrongdoing, Plaintiff was not receiving a product of the quality, nature or fitness that had been represented by Defendants or that Plaintiff, as a reasonable consumer, expected.

-28-

122.    By virtue of the conscious wrongdoing alleged above, Defendants have been unjustly enriched at the expense of the Plaintiff, who is entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

## COUNT X

### Loss of Consortium

123.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims for Relief section of Plaintiffs' Complaint as if fully set forth herein.

124.    At all times relevant hereto, Plaintiff Pamela West, on behalf of herself and all other similarly situated Spouse plaintiffs, has suffered injuries and losses as a result of Plaintiffs' injuries.

125.    For the reasons set forth herein, Spouse Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment and for medications and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

126.    For the reasons set forth herein, Spouse Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

127.    For all Spouse Plaintiffs, Plaintiff alleges her marital relationship has been impaired and depreciated, and the marital association between husband and wife has been altered.

128.    Spouse Plaintiffs have suffered great emotional pain and mental anguish.

129.    As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs have sustained and will continue to sustain severe physical injuries severe emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  Defendants are liable to Spouse Plaintiffs for all general, special and equitable relief to which Spouse Plaintiffs are entitled by law.

**COUNT XI**

**Declaratory Relief and Medical Monitoring**

130.    Plaintiffs, on behalf of themselves and all others similarly situated, re-alleges the allegations contained in the foregoing paragraphs.

131.    Plaintiff and Class members have no adequate remedy at law and damages cannot adequately compensate Plaintiff and Class members for the injuries suffered and threatened, rendering declaratory, injunctive, and other equitable relief appropriate.

132.    Through the unlawful conduct set forth in the preceding paragraphs, Plaintiff and tens of thousands of Class members have been implanted with a device which tends to fracture, and otherwise malfunction.  These defects have potentially fatal consequences for many patients who rely upon the presence of the leads connected to the ICDs to regulate their cardiac rhythms.

133.    There are medical risks to Plaintiff and Class members associated with having the defective Sprint Fidelis leads explanted, as they have been implanted directly onto the heart wall. Explanation procedures expose Plaintiff and Class members to significant risks attendant to surgery, not least of which are potentially life-threatening infections and other harm.

134.    At the same time, Plaintiff and Class members, along with their physicians, must weigh these risks against the possibility that Medtronic's Sprint Fidelis leads will fail or have failed to function as designed, represented and intended, resulting in an increased risk of heart damage, failure and/or death.

135.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, requests the following classwide equitable relief:

(a)    That Medtronic be ordered to notify all potential Class members of the defective nature of the Sprint Fidelis leads;

(b)    That Medtronic be ordered to create a treatment fund, under the continuing jurisdiction and supervision of this Court, to monitor the health of Plaintiff and Class members, and to pay or reimburse Plaintiff and Class members for all evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and incidental expenses caused by Medtronic's wrongdoing; and

-30-

1            (c)     Declaratory judgment that Medtronic is liable to Plaintiff and all Class

2 members for all evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical,

3 and incidental expenses, costs and losses caused by Medtronic's wrongdoing.

4

5                         **PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray

7 for judgment against Medtronic as follows:

8       1.     For an Order certifying the Class and any appropriate subclasses thereof under the

9 appropriate provisions of Federal Rule of Civil Procedure 23, and appointing Plaintiffs and their

10 counsel to represent the Class;

11       2.     For the equitable relief requested;

12       3.     For compensatory damages according to proof;

13       4.     For punitive or exemplary damages against Medtronic, consistent with the degree

14 of Medtronic's reprehensibility and the resulting harm or potential harm to Plaintiff and the Class,

15 and in an amount sufficient to punish Medtronic and deter others from similar wrongdoing;

16       5.     For all applicable statutory damages under the consumer protection legislation of

17 California, Minnesota, Florida, and all states and the District of Columbia;

18       6.     For declaratory judgment that Medtronic is liable to Plaintiff and Class members

19 for all evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and

20 incidental expenses, costs and losses caused by Medtronic's wrongdoing;

21       7.     For notice to be disseminated to all Class members who have been implanted with

22 Sprint Fidelis leads;

23       8.     For a restitution and disgorgement of profits;

24       9.     For an award of attorneys' fees and costs;

25       10.    For prejudgment interest and the costs of suit; and

26

27 ///

28 ///

CLASS ACTION COMPLAINT

1    11.    For such other and further relief as this Court may deem just and proper.

2    DATED: November 8, 2007            KERSHAW, CUTTER & RATINOFF, LLP

3

4    _____
     DAVID E. SMITH
5    C. BROOKS CUTTER
     STUART C. TALLEY
6    980 9TH Street, 19th Floor
     Sacramento, CA 95814
7    Telephone: 916-448-9800
     Facsimile: 916-669-4499
8
     RICHARD A. LOCKRIDGE
9    ROBERT K. SHELQUIST
     YVONNE M. FLAHERTY
10   LOCKRIDGE GRINDAL NAUEN P.L.L.P.
     100 Washington Avenue South, Suite 2200
11   Minneapolis, MN 55401-2197
     Telephone: 612-339-6900
12   Facsimile: 612-339-0981

13   *Attorneys for Plaintiffs West and the Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-32-

1

## JURY DEMAND

2    Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial

3    by jury in this case as to such issues so triable.

4    DATED: November 8, 2007          KERSHAW, CUTTER & RATINOFF, LLP

5

6    _____

7                                      C. BROOKS CUTTER
                                       DAVID E. SMITH
8                                      STUART C. TALLEY
                                       980 9TH Street, 19th Floor
9                                      Sacramento, CA 95814
                                       Telephone: 916-448-9800
10                                     Facsimile: 916-669-4499

11
                                       RICHARD A. LOCKRIDGE
12                                     ROBERT K. SHELQUIST
                                       YVONNE M. FLAHERTY
13                                     LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                       100 Washington Avenue South, Suite 2200
14                                     Minneapolis, MN  55401-2197
                                       Telephone:  612-339-6900
15                                     Facsimile: 612-339-0981

16
                                       ***Attorneys for Plaintiffs West and the Class***
17

18

19

20

21

22

23

24

25

26

27

28

-33-